**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Tacey Haberkorn,<br><br>    *on behalf of herself and all others*<br>    *similarly situated*,<br><br>                              Plaintiff,<br><br>v.<br><br>1889 – CHS Foundation, Inc., f/k/a<br>Conemaugh Health System, Inc., d/b/a<br>Conemaugh Health System,<br><br>                              Defendant. | Case No. 3:23-CV-93<br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

1.    Plaintiff Tacey Haberkorn, at all times relevant herein, has been a patient of Conemaugh Health System ("Conemaugh" or "Defendant"), and brings this class action against Defendant in her individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions, her counsels' investigation, and upon information and belief as to all other matters, as follows:

2.    Plaintiff brings this case to address Defendant's unlawful practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook"), without consent.

3.    Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information

1

can have serious consequences, including discrimination in the workplace or denial of insurance coverage. [1]

4.      Simply put, if people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

5.      The need for data security (and transparency) is particularly acute when it comes to the rapidly expanding world of digital healthcare as, of all the information the average internet user shares online, health data is some of the most valuable and controversial.[2]

6.      Despite professing to value patients' privacy and vowing to protect the confidentiality and security of their private and protected health information, healthcare entities, like Defendant, are collecting, in some instances, "ultra-sensitive personal data" about patients

---

[1] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022), available at https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited May 1, 2023) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), available at https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited May 8, 2023).

[2] Protected and highly sensitive medical information collected by healthcare entities includes many categories from intimate details of an individual's conditions, symptoms, diagnoses and treatments to personally identifying information to unique codes which can identify and connect individuals to the collecting entity. *See* Molly Osberg & Dhruv Mehrotral, *The Spooky, Loosely Regulated World of Online Therapy*, JEZEBEL (Feb. 19, 2020), available at *https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137* (last visited May 8, 2023).

"ranging from those seeking information about their reproductive rights and options, those seeking information regarding their addictions and . . . those seeking mental health counseling."[3]

7.     And, while mobile health options have been celebrated as a way to expand treatment options, the tangible, real-world implications and potential for abuse is staggering:

> [T]he sensitive information people share during treatment for substance use disorders could easily impact their <u>employment</u> status, ability to get a home, custody of their children, and even their freedom. Health care providers and lawmakers recognized long ago that the potential threat of losing so much would deter people from getting life-saving help and set up strict laws to protect those who do seek treatment. ***Now, experts worry that data collected on telehealth sites could bring about the harm [the law] was designed to prevent and more, even inadvertently***.[4]

8.     Recognizing these incontrovertible facts and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

---

[3] Grace Oldham & Dhruv Mehrotra, *Facebook and Anti-Abortion Clinics Are Collecting Highly Sensitive Info on Would-Be Patients*, REVEAL (June 15, 2022), available at https://revealnews.org/article/facebook-data-abortion-crisis-pregnancy-center/ (noting that such "personal data can be used in a number of ways. The centers can deliver targeted advertising, on Facebook or elsewhere, aimed at deterring an individual from getting an abortion. It can be used to build anti-abortion ad campaigns – and spread misinformation about reproductive health – targeted at people with similar demographics and interests. And, in the worst-case scenario now contemplated by privacy experts, that digital trail might even be used as evidence against abortion seekers in states where the procedure is outlawed") (last visited May 10, 2023).
[4] *Id.* (emphasis added).

9.    Healthcare organizations regulated under HIPAA may use third-party tracking tools, such as Google Analytics or Meta Pixel, only in a limited way, to perform analysis on data key to operations:

> To be sure, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals 'HIPAA-compliant authorizations, would constitute impermissible disclosures.***[5]

10.    In addition, Pennsylvania law provides that "all [medical] records shall be treated as confidential," and that a hospital must receive written authorization of a patient "for release of medical information outside the hospital." 28 Pa.C.S.A. § 115.27.[6] Further, the Pennsylvania Patient's Bill of Rights provides that "a patient has the right to every consideration of his privacy concerning his own medical care program" and "the right to have all records pertaining to his medical care treated as confidential except as otherwise provided by law or third-party contractual arrangements." 28 Pa.C.S.A. § 103.22(b)(3-4).

11.    Defendant owns and controls www.conemaugh.org ("Defendant's Website" or the "Website"), which it encourages patients to use for booking medical appointments, locating

---

[5] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited May 10, 2023) (emphasis added).

[6] Pennsylvania law also states that "medical records are the property of the hospital" but that "they shall not be removed from the hospital premises except for court purposes" and that copies may only be made available "for authorized appropriate purposes such as insurance claims, and physician review, consistent with § 115.27 (relating to confidentiality of medical records)." 28 Pa.C.S.A. §115.28.

physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes, and more.

12. Defendant devotes a section of its Website to the "Conemaugh MyChart" Patient Portal ("MyChart"), which encourages patients to sign up to access the MyChart portal so that they can more conveniently book appointments and schedule visits, review their health records and test results, pay bills, communicate with service providers, request prescription refills, and complete medical forms virtually and remotely.[7]

13. Between the Website and MyChart (collectively referred to herein as the Conemaugh "Digital Platform"), Conemaugh advertises to its prospective and current patients that its online functionality is a secure and private means of interacting with Conemaugh and its health providers.

14. Plaintiff and other Class Members who used Defendant's Digital Platform understandably thought they were communicating only with their trusted healthcare provider. Unbeknownst to Plaintiff and Class Members, however, Defendant had embedded the Facebook Tracking Pixel (the "Pixel" or "Facebook Pixel") into its Digital Platform, surreptitiously forcing Plaintiff and Class Members to transmit their Private Information to Facebook.

15. Operating as designed and as implemented by Defendant, the Pixel allows the Private Information that Plaintiff and Class Members submit to Defendant to be unlawfully disclosed to Facebook alongside the individual's unique and persistent Facebook ID ("FID").[8]

---

[7] https://www.conemaugh.org/patient-portal (last visited May 10, 2023)
[8] The Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited April 18, 2023).

16.     A pixel is a piece of code that "tracks the people and [the] type of actions they take"[9] as they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, and the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), among other things.

17.     The user's web browser executes the Pixel via instructions within the webpage to communicate certain information based on parameters selected by the website's owner. The Facebook Pixel is thus customizable and programmable, meaning that the website owner controls which of its webpages contain the Pixel and which events are tracked and transmitted to Facebook.

18.     When a website user visits a webpage containing Pixels, their device is commandeered, and their communications are surreptitiously duplicated and transmitted to third parties. Stated differently, Defendant's Digital Platform and Pixel purposely altered patients' web browsers, forcing them to duplicate and redirect communications to third-party web servers.

19.     The information sent to third parties included the Private Information that Plaintiff and Class Members submitted to Defendant's Digital Platform related to their past, present, or future health conditions, including, for example, the type and date of a medical appointment and physician. Such Private Information would allow the third party (e.g., Facebook or Google) to know that a specific patient was seeking confidential medical care and the type of medical care being sought. This disclosure would also allow a third party to reasonably infer that a specific patient was being treated for a specific type of medical condition such as cancer, pregnancy, or addiction.

---

[9] Facebook, *Retargeting*, https://www.facebook.com/business/goals/retargeting (last visited April 18, 2023)

20.     Simply put, by installing the Facebook Pixel into its Digital Platform, Defendant effectively planted a bug on Plaintiff and Class Members' web browsers and compelled them to disclose their communications with Defendant to Facebook.

21.     In addition to the Facebook Pixel, Defendant also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its Website servers.[10]

22.     Unlike the Facebook Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers.[11, 12] Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[13]

23.     Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Pixel from sending website users' Private Information to Facebook directly.

---

[10]     "CAPI works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Jan. 25, 2023).
[11] https://revealbot.com/blog/facebook-conversions-api/ (last visited Jan. 24, 2023).
[12] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api (last visited Jan. 27, 2023).
[13] https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Jan. 28, 2023).

24.     Defendant utilized the Pixel and CAPI data for marketing purposes in an effort to bolster its profits. The Facebook Pixel and CAPI are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendant.

25.     The information disclosed in this way by Defendant allows a third party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers who geotarget Plaintiff's and Class Members' Facebook pages based on communications obtained via the Facebook Pixel and CAPI.

26.     The Office for Civil Rights (OCR) at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies ("tracking technologies").[14] The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules." In other words, HHS has expressly stated that entities like Defendant that implement the Facebook Pixel have violated HIPAA Rules.

27.     The HHS Bulletin further warns that:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss,

---

[14] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Feb. 20, 2023).

discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [15]

28.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send personal health information or confidential medical information collected via its webpages to a hidden third party – let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue – without the patients' consent. Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook.

29.     Despite willfully and intentionally incorporating the Facebook Pixel and CAPI into its Digital Platform and servers, Defendant has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with Facebook. Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to Facebook as they communicated with their healthcare provider via the Digital Platform or stored on Defendant's servers to be later transmitted to Facebook so it could be used for targeted advertising and marketing purposes.

---

[15] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Apr. 18, 2023).

30.    Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, inter alia,: (i) failing to adequately review its marketing programs and web-based technology to ensure the hospital Digital Platform was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Facebook Pixels; (v) failing to warn Plaintiff and Class Members; and (vi) otherwise failing to design, and monitor its Digital Platform to maintain the confidentiality and integrity of patient Private Information.

31.    As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of the Private Information, (iv) statutory damages, and (v) the continued and ongoing risk to their Private Information.

32.    Plaintiff seeks to remedy these harms and brings causes of action for (1) violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A §§ 5701., *et seq.*; (2) invasion of privacy; (3) breach of implied contract; (4) unjust enrichment; (5) breach of fiduciary duty; (6) violations of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1) – unauthorized interception, use, and disclosure; (7) breach of confidence; (8) negligence; and (9) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1., *et seq*.

## PARTIES

33.    Plaintiff Tacey Haberkorn is a natural person and citizen of Pennsylvania where she intends to remain.

34.    Defendant 1889 – CHS Foundation, Inc. is a Pennsylvania domestic non-profit corporation formerly known as Conemaugh Health System, Inc., and doing business as Conemaugh Health System. Defendant 1889 – CHS Foundation Inc. is referred to herein as "Conemaugh" or "Defendant." Conemaugh has a principal place of business located at 4 Valley Pike, Johnstown, PA 15905.

35.    Per its website, "Conemaugh Health System, of Duke LifePoint Healthcare, is the largest healthcare provider in west central Pennsylvania, serving over a half-million patients each year through the Conemaugh Physician Group and Medical Staff, a network of hospitals, specialty clinics and patient focused programs. Conemaugh Health System employs over 5,000 clinical and non-clinical staff, and over 450 physicians committed to providing the ideal patient experience."[16]

36.    Conemaugh operates four hospitals, Conemaugh Memorial Medical Center, Conemaugh Meyersdale Medical Center, Conemaugh Miners Medical Center, Conemaugh Nason Medical Center, and three outpatient centers, Conemaugh East Hills, Conemaugh Ebensburg, and Conemaugh Somerset.[17]

37.    Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

---

[16] https://www.conemaugh.org/about (last visited Apr. 13, 2023)
[17] https://www.conemaugh.org/outpatient-centers (last visited Apr. 14, 2023)

**JURISDICTION & VENUE**

38.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

39.     This Court has federal question jurisdiction under 29 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (28 U.S.C. § 2511, *et seq.*).

40.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

41.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

**COMMON FACTUAL ALLEGATIONS**

**A. Background: Underlying Technology Employed by Defendant for the Purpose of Disclosing Plaintiff and Class Members' Private Information to Facebook**

42.     Defendant uses its Digital Platform to connect Plaintiff and Class Members to Defendant's digital healthcare platforms with the goal of increasing profitability.

43.     In furtherance of that goal, and to increase the success of its advertising and marketing, Defendant purposely installed the Pixel and CAPI tools on many of its webpages within its Digital Platform and on its servers and programmed those webpages and servers. In doing so, Defendant surreptitiously shared patients' private and protected communications with Facebook, including communications that contain Plaintiff's and Class Members' Private Information.

44.     To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows:

### i. Facebook's Business Tools and the Pixel

45.     Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[18]

46.     In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

47.     Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

48.     The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, the webpage's Universal Resource Locator ("URL"), as well as metadata, button clicks, and other information.[19] Businesses that want to target customers and advertise their services, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[20]

---

[18] Facebook, *Meta Reports Fourth Quarter and Full Year 2021 Results* , https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Apr. 5, 2023).

[19]     Facebook, *Specifications for Facebook Pixel Standard Events,* https://www.facebook.com/business/help/402791146561655?id=1205376682832142. (last visited Mar. 1, 2023); *see* Facebook, *Facebook Pixel, Accurate Event Tracking, Advanced*, https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited Apr. 5, 2023); *see also* Facebook, *Best Practices for Facebook Pixel Setup*, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; Facebook, *App Events API*, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Apr. 5, 2023).

[20]     Facebook, *About Standard and Custom Website Events*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* Facebook, *App Events API*, *supra*.

49.    One such Business Tool is the Pixel that "tracks the people and type of actions they take."[21] When a user accesses a webpage that is hosting the Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook—traveling from the user's browser to Facebook's server.

50.    Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate privacy (such as the homepage) and disable it on pages that do implicate patient privacy (such as the "find a doctor" page). Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook via the Pixel but for Defendant's decisions to install the Pixel on its Digital Platform and specifically on the webpages that solicit and receive Private Information.

51.    Similarly, Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook via Conversions API but for Defendant's decision to install and implement that tool on its servers.

52.    By installing and implementing both tools, Defendant caused Plaintiff's and Class Member's communications to be intercepted and transmitted from Plaintiff's and Class Members' browsers directly to Facebook via the Pixel, or to be recorded on Defendant's servers and then transferred to Facebook via Conversions API.[22]

---

[21] Facebook, *Retargeting*, https://www.facebook.com/business/goals/retargeting.

[22] Facebook assigns a unique "event_id" parameter to each separate communication with a website and then deduplicates the data based on the event_id so that the same event tracked by the Pixel and recorded by the CAPI are not reported as two separate events. https://www.facebook.com/business/help/702509907046774 (last visited Jan. 28, 2023).

*ii. Defendant's Method of Transmitting Plaintiff's and Class Members' Private Information via the Tracking Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Pixel*

53.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accessed web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

54.    Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

55.    Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses. Any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies[23]:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests are a separate type of HTTP Request that can send a large amount of data outside of the URL (*e.g.*, uploading a PDF to a court's ECF system for filing a motion).

---

[23]"Cookies are small files of information that a web server generates and sends to a web browser. …Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Apr. 5, 2023).

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies that have been placed on the client device are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies" which means they can store and communicate data to the cookie owner's website when the user is visiting an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[24] HTTP Responses can also send cookies or other code hidden and embedded in the webpage to the client device's browser.

56.     When an individual visits Defendant's Website, an HTTP Request is sent from that individual's web browser to Defendant's servers that essentially asks Defendant's Website to retrieve certain information (such as Defendant's "Schedule Appointment Now" page). The HTTP Response from Defendant's servers sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Website.

57.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

58.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the

---

[24] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

web browser's user. Defendant's customized implementation of the Pixel is source code that does just that. The Pixel acts much like a traditional wiretap. When patients visit Defendant's website via an HTTP Request to Defendant's server, Defendant's server sends an HTTP Response including the Markup that displays the Webpage visible to the user along with Source Code that includes Defendant's Pixel. In essence, Defendant is handing patients a bugged phone. Once the Webpage loads in the patient's browser, the software-based wiretap quietly waits for a communication from the patient to trigger the tap, which intercepts those communications intended only for Defendant and transmits them to third-parties, including Facebook.

59.    Separate from the Pixel, Facebook and other website owners can place third-party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as he moves around the internet – whether on the cookie owner's website or not. Facebook uses this type of third-party cookie when Facebook account holders use the Facebook app or website. As a result, when a Facebook account holder uses Defendant's Website, a unique id is sent to Facebook along with the intercepted communication that allows Facebook to identify the patient associated with the Private Information it has intercepted.

60.    With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. To counteract this, third parties bent on gathering data and Private Information implement workarounds that are difficult to detect or evade. Facebook's workaround is its Conversions API tool, which is particularly effective because the data transmitted via this tool does not rely on the website visitor's web browsers. Rather, the information travels directly from Defendant's server to Facebook's server.

61.    Conversions API "is designed to create a direct connection between [Web hosts']
marketing data and [Facebook]." Thus, Defendant receives and stores its communications with
patients on its server before Conversions API collects and sends those communications—and the
Private Information contained therein—to Facebook.

62.    Notably, client devices do not have access to host servers and thus cannot prevent
(or even detect) this additional transmission of information to Facebook.

63.    While there is no way to confirm with certainty that a website owner is using
Conversions API without accessing the host server, Facebook instructs companies like Defendant
to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both
tools," because such a "redundant event setup" allows Defendant "to share website events [with
Facebook] that the pixel may lose."[25] Thus, since Defendant implemented the Pixel in accordance
with Facebook's documentation, it is also reasonable to infer that Defendant implemented the
Conversions API tool on its website.

64.    The third parties to whom a website transmits data through pixels and associated
workarounds do not provide any substantive content on the host website. In other words, Facebook
and others like it are not providing anything to the user relating to the user's communications.
Instead, these third parties are typically procured to track user data and communications only to
serve the marketing purposes of the website owner (*i.e.,* to bolster profits).

65.    Thus, without any knowledge, authorization, or action by a user, a website owner
like Defendant can use its source code to commandeer its patients' computing devices, causing the

---

[25] *See* https://www.facebook.com/business/help/308855623839366?id= 818859032317965 (last visited
Jan. 23, 2023).

device's web browser to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Facebook.

66.    In this case, Defendant employed the Tracking Pixel and Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook.

67.    For example, when a patient visits conemaugh.org and selects the "Find a Doctor" button, the patient's browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage as depicted below.



*Figure 1. The image above is a screenshot taken from the user's web browser upon using https://www.conemaugh.org/find-a-doctor (last accessed Apr. 10, 2023).*

68.    The patient visiting this particular web page only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses.

69.    The Facebook Tracking Pixel is embedded in Defendant's Source Code, which is contained in the HTTP Response sent to the patient's web browser. When the patient's browser receives the HTTP Response, the Pixel, which is programmed to automatically track and transmit the patient's communications with Defendant's Digital Platform to Facebook, executes instructions that effectively open a hidden spying window into the patient's browser through which Facebook can intercept the visitor's data, actions, and communications with Defendant.[26]

70.    Looking to the previous example, Defendant's Source Code containing the Pixel manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Facebook.

71.    This communication to Facebook occurs contemporaneously, invisibly, and without the patient's knowledge.

72.    Thus, without its patients' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" patients' computing devices, allowing Facebook to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

73.    Consequently, when Plaintiff and Class Members visit Defendant's Digital Platform and communicate their Private Information, including, but not limited to, medical treatment sought, appointment type, selected physician's name and specialty, specific button/menu selections, content (such as searches for symptoms or treatment options) typed into free text boxes,

---

[26] When used in the context of a screen or visual display, a "pixel" is the smallest unit in such a digital display. An image or video on a device's screen can be made up of millions of individual pixels. The Facebook Pixel is a tiny image file that is so small as to be invisible to website users. It is purposefully designed and camouflaged in this manner so that website users remain unaware of it.

and demographic information, it is simultaneously intercepted and transmitted to Facebook, in some cases even when the user chooses not to send the content to the Defendant.

**B. Defendant Disclosed Plaintiff's and Class Members' Private Information to Facebook Using the Pixel and/or Conversions API Tracking Practices**

74.    Defendant utilizes Facebook's Business Tools and intentionally installed the Pixel and Conversions API on its Digital Platform and servers to secretly track patients by recording their activity and experiences in violation of its common law, contractual, statutory, and regulatory duties and obligations.

75.    Defendant's Pixel has its own unique identifier, represented as id=1997456253895084 or id=1174815373045204, which can be used to identify which of Defendant's webpages contain the Pixel.

76.    The Pixel allows Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.[27] However, Defendant's Digital Platform does not rely on the Pixel in order to function.

77.    While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Defendant via its Digital Platform.

78.    Plaintiff and Class Members were not aware that their Private Information would be shared with Facebook as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

79.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to Facebook, nor did they intend for

---

[27] https://www.facebook.com/business/tools/meta-pixel.

Facebook to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

80.    Defendant's Pixel and Conversions API sent non-public Private Information to Facebook, including but not limited to Plaintiff's and Class Members': (1) status as medical patients; (2) health conditions; (3) desired medical treatment or therapies; (4) appointment requests; (5) desired locations or facilities where treatment was sought; and (6) phrases and search queries (such as searches for symptoms, treatment options, or types of providers) conducted via the general search bar.

81.    Importantly, the Private Information Defendant's Pixel sent to Facebook was sent alongside the Plaintiff's and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts and therefore their identity.[28]

82.    Facebook describes itself as a "real identity platform,"[29] meaning users are allowed only one account and must share "the name they go by in everyday life."[30] To that end, when creating an account, users must provide their first and last name, date of birth, and gender.[31]

83.    A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests,

---

[28] Defendant's Website track and transmit data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

[29] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[30] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[31] FACEBOOK, SIGN UP, https://www.facebook.com/

work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

84.    Defendant deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented technology (i.e., the Facebook Pixel and Conversions API) that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to Facebook—an unauthorized third-party; and (3) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

### i. Facebook Exploited and Used Plaintiff's and Class Members' Private Information

85.    Unsurprisingly, Facebook does not offer its Pixel to companies like Defendant solely for Defendant's benefit. "Data is the new oil of the digital economy,"[32] and Facebook has built its more-than $300 billion market capitalization on mining and using that 'digital' oil. Thus, the large volumes of personal and sensitive health-related data Defendant provided to Facebook are actively viewed, examined, analyzed, curated, and put to use by the company. Facebook acquires the raw data to transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. Indeed, Facebook offers the Pixel free of charge[33] and the price that Defendant pays for the Pixel is the data that it allows Facebook to collect.

---

[32] https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/ (last visited Apr. 5, 2023).

[33] https://seodigitalgroup.com/facebook-pixel/ (last visited Apr. 18, 2023).

86.     Facebook sells advertising space by emphasizing its ability to target users.[34] Facebook is especially effective at targeting users because it surveils user activity both on and off its site (with the help of companies like Defendant).[35] This allows Facebook to make inferences about users beyond what they explicitly disclose, including their "interests," "behavior," and "connections."[36] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[37]

87.     Advertisers can also build "Custom Audiences,"[38] which helps them reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[39] With Custom Audiences, advertisers can target existing customers directly. They can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[40] Unlike Core Audiences, Custom Audiences and Lookalike

---

[34] FACEBOOK, WHY ADVERTISE ON FACEBOOK,
https://www.facebook.com/business/help/205029060038706 (last visited Apr. 18, 2023).

[35] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Apr. 18, 2023).

[36] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting (last visited Apr. 18, 2023).

[37] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences (last visited April 18, 2023).

[38] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited April 18, 2023).

[39] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting (last visited April 18, 2023).

[40] Facebook, About Lookalike Audiences,
https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited April 18, 2023).

Audiences are only available if the advertiser has sent its underlying data to Facebook. This data can be supplied to Facebook by manually uploading contact information for customers or by utilizing Facebook's "Business Tools" like the Pixel and Conversions API.[41]

88.    Facebook does not merely collect information gathered by the Pixel and store it for safekeeping on its servers without ever viewing or accessing the information. Instead, in accordance with the purpose of the Pixel to allow Facebook to create Core, Custom, and Lookalike Audiences for advertising and marketing purposes, Facebook viewed, processed, and analyzed Plaintiff's and Class Members' confidential Private Information. Upon information and belief, such viewing, processing, and analyzing was performed by computers and/or algorithms programmed and designed by Facebook employees at the direction and behest of Facebook.

89.    Facebook receives over 4 petabytes[42] of information every day and must rely on analytical tools designed to view, categorize, and extrapolate the data to augment human effort.[43] This process is known as "data ingestion" and allows "businesses to manage and make sense of large amounts of data."[44]

---

[41] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494 (last visited April 18, 2023); Facebook, Create a Website Custom Audience, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last visited April 18, 2023).

[42]  A petabyte is equal to one million gigabytes (1,000,000 GB).

[43]    https://medium.com/@srank2000/how-facebook-handles-the-4-petabyte-of-data-generated-per-day-ab86877956f4 (last visited April 18, 2023). Facebook employees would not be able to view each piece of data individually – millions of them per second – without the aid of technology. Just as a microscope or telescope allows the user to see very small or very distant objects by zooming in, however, Facebook's big data management software allows the company to see all of this data at once by zooming out.

[44]  https://scaleyourapp.com/what-database-does-facebook-use-a-1000-feet-deep-dive/ (last visited April 18, 2023).  Facebook uses ODS, Scuba, and Hive to manage its massive data stores. These technologies are not traditional databases; they are specialized databases for big data designed to process data specifically for analysis—"such as [viewing] hidden patterns, correlations, market trends and customer preferences."

90.    By using data ingestion tools, Facebook is able to rapidly translate the information it receives from the Pixel in order to display relevant ads to consumers. For example, if a consumer visits a retailer's webpage and places an item in their shopping cart without purchasing it, the next time the shopper visits Facebook, an ad for that item will appear on the shopper's Facebook page.[45] This evidences that Facebook views and categorizes data as they are received from the Pixel.

91.    Moreover, even if Facebook eventually deletes or anonymizes Private Information that it receives, it must first view that information in order to identify it as containing Private Information suitable for removal. Accordingly, there is a breach of confidentiality the instant the information is disclosed or received without authorization. As described by the HHS Bulletin:

> It is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure.[46]

**ii.    Defendant's Pixel Disseminates Patient Information via Its Digital Platform**

92.    An example illustrates the point. If a patient uses conemaugh.org to book an appointment with a cardiologist, Defendant's Website directs them to communicate Private Information. Unbeknownst to the patient, each and every communication is sent to Facebook via Defendant's Pixel, including the medical condition the patient types into the search bar and the filters they select.

---

[45] https://www.oberlo.com/blog/facebook-pixel (last visited April 18, 2023).
[46] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis in original) (last visited April 18, 2023).

93.    In the example below, the user typed "I have hypertension" into the search bar, and then used the filtering tools to identify a "Female" physician who speaks "English," is specialized in "Cardiology," and is currently "Accepting New Patients."



*Figure 2. Screenshot taken from conemaugh.org as the user searches for a cardiologist and communicates information via the search bar and filtering tools.*

94.    Unbeknownst to ordinary patients, this particular webpage—which is undoubtedly used to communicate Private Information for the purpose of seeking medical treatment—contains Defendant's Pixel. The image below shows the "behind the scenes" portion of the website that is

invisible to ordinary users. Importantly, each entry in the column represents just one instance in which Defendant's Pixel sent this particular user's information to Facebook.



*Figure 3. Screenshot taken from conemaugh.org which shows the mark-up (user-facing portion of the website) alongside the network traffic. Each entry in the column to the right represents just one instance in which the user's information was transmitted to Facebook via Defendant's pixel.*

95.    Thus, without alerting the user, Defendant's Pixel sends each and every communication the user made via the webpage to Facebook, and the images below confirm that the communications Defendant sends to Facebook contain the user's Private Information.



*Figure 4. Screenshot taken from user's network traffic report during their physician search.*

96.    The image above shows what information is sent to Facebook when the user continues their search by typing their address into the distance filter. The first line of highlighted

text, "id:1174815373045204," refers to Defendant's Pixel ID and confirms that Defendant has downloaded the Pixel into its Source Code for this particular webpage.

97.    The second line of text, "ev: PageView," identifies and categorizes which actions the user took on the Webpage ("ev:" is an abbreviation for event, and "PageView" is the type of event). Thus, this identifies the user as having viewed the particular webpage after applying their search criteria, and it also identifies them as having requested the content from Defendant via the user's GET Request.

98.    The next lines of highlighted text show Defendant has disclosed to Facebook that the user: (1) is a patient seeking medical care from Defendant via www.conemaugh.org; (2) in conjunction    with    a    specific    medical    condition    (highlighted    above    as "query=i+have+hypertension"); and (3) is in the process of booking an appointment or searching for a particular physician ("find-a-doctor") who is female "gender=f", speaks English "language=en," and is accepting new patients "isAcceptingNewPatients=true." The exact address the user communicated is also transmitted to Facebook, "address=90+Johns+St . . . Johnstown . . . PA+15901."

99.    If a patient searches for their cardiologist by name, that physician's name and specialty is also transmitted to Facebook as shown in the images below.



*Figure 5. Screenshot that includes the user's network traffic alongside the mark-up for this particular webpage.*

100.    The highlighted text reveals the identity of the user's physician or prospective physician (highlighted above as "michelle+stoudt . . . do"), and the physician's particular field of medicine or specialty "query=cardiologist."

101.    Importantly, each time the user's communications are transmitted to Facebook, Facebook receives them alongside the user's Facebook ID (highlighted as "c_user=" in the images below) thereby allowing the user's communications and actions on the website to be linked to their specific Facebook profile.[47]

---

[47] The user's Facebook ID is represented as the c_user ID highlight in the image above, and Plaintiff has redacted the corresponding string of numbers to preserve the user's anonymity.



*Figure 6. Screenshot of the user's network traffic depicting the user's URL Request headers associated with Defendant's Pixel ID 1997456253895084.*



*Figure 7. Screenshot of the user's network traffic depicting the user's URL Request headers associated with Defendant's Pixel ID 1174815373045204.*

102.    Although the images above appear to be identical, they represent two distinct transmissions of the user's communications and interactions on Defendant's Digital Platform. The first transmission is attributed to Pixel ID 1997456253895084, and the second transmission is attributed to Pixel ID 1174815373045204. In each instance, Facebook receives the transmission

alongside the user's c_user ID, thereby uniquely identifying the individual and matching the communication and underlying data with their unique Facebook account.

103.    Defendant's ability to control and manipulate the Pixel is made evident by its use of custom events. For example, in the image below, Defendant has created a custom event that is coded and transmitted to Facebook as "ev: FindDoctor." Thus, in addition to default events like "SubscribedButtonClicks" and "PageViews," Defendant is actively broadcasting the fact that the individual user is seeking medical care via its Digital Platform.



*Figure 8. Screenshot taken from the user's network traffic report showing that Defendant has created custom events using the Facebook Pixel.*

104.    To make matters worse, Defendant tracks, transmits, and records the exact text and phrases its patients type into the general search bar on its homepage, conemaugh.org.



*Figure 9. Screenshot taken when the user types "I have dementia" into the general search bar on Defendant's homepage.*

105.    In the example above, the user typed "I have dementia" into the search bar, and Defendant's Pixel sent that exact phrase to Facebook, thereby allowing the user's medical condition to be linked to their individual Facebook account for future retargeting and exploitation. This is simply unacceptable, and there is no legitimate reason for sending this information to Facebook.





*Figures 10 & 11. Screenshots take from the user's traffic report depicting the "Payload" and corresponding "Headers" associated with the user's online activity and communications to Defendant.*

106.    In each of the examples above, the user's website activity and the contents of the user's communications are sent to Facebook alongside their personally identifiable information.

Several different methods allow marketers and third-parties to identify individual website users,

but the examples above demonstrate what happens when the website user is logged into Facebook on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

107.    Facebook receives at least six cookies when Defendant's website transmits information via the Pixel:

| Request Cookies | | ☐ show filtered out request cookies |
|---|---|---|
| Name | Value | Domain |
| sb | sS5IZ... | .facebook.com |
| datr | si5IZ... | .facebook.com |
| c_user | 1505... | .facebook.com |
| usida | eyJ2Z... | .facebook.com |
| xs | 47%3... | .facebook.com |
| fr | 0m1E... | .facebook.com |

*Figure 12.*

108.    When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies:[48]

| fr | 00Zp... | .facebook.com |
|---|---|---|
| wd | 1156... | .facebook.com |
| sb | qqAz... | .facebook.com |
| datr | Malz... | .facebook.com |

*Figure 13.*

---

[48]    The screenshot below serves as example and demonstrates the types of data transmitted during an HTTP single communication session. Not pictured here and in the preceding image is the _fbp cookie, which is transmitted as a first-party cookie.

109.    The fr cookie contains an encrypted Facebook ID and browser identifier.[49] Facebook, at a minimum, uses the fr cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days *after* the user has logged out of Facebook.[50]

110.    The cookies listed above in figures 12 and 13 are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Although Facebook created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout its website.

111.    Defendant also revealed its website visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user:[51]

| _fbp | fb.1.1681149483157.865798246 | .conemaugh.org |
|------|------------------------------|----------------|

*Figure 14.*

112.    Importantly, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike the fr cookies and c_user cookie, the _fbp cookie functions as a first-party cookie—i.e. a cookie that was created and placed on the website by Defendant.[52]

113.    The Facebook Tracking Pixel uses both first- and third-party cookies.

---

[49]    Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit* (Sept. 21, 2012), p. 33, http://www.europe-v-facebook.org/ODPC_Review.pdf (last visited May 11, 2023).

[50]    *Cookies & other storage technologies*, FACEBOOK.COM, https://www.facebook.com/policy/cookies/ (last visited May 11, 2023).

[51]    *Id.*

[52]    The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

114. In summation, Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

115. The full breadth of Defendant's tracking and data sharing practices is unclear, but other evidence suggests Defendant is using additional tracking pixels and tools to transmit its patients' Private Information to additional third parties. For example, the images below indicate that Defendant is also sending its patients' protected health information to Google via the Google Analytics tool and Google Tag Manager.

116. Both images below contain the user's search phrase ("I have dementia"), and Defendant does not appear to have enabled the anonymize feature provided by Google Analytics because the text "aip:" does not appear in either image below.



▼ Request Headers

:authority: www.google-analytics.com

:method: POST

:path: /g/collect?v=2&tid=G-TQ4RZV8NJ7&gtm=45je3430&_p=1982854645&cid=378358411.1681144741&ul=en-us&s
r=1920x1080&uaa=x86&uab=64&uafvl=Microsoft%2520Edge%3B111.0.1661.62%7CNot(A%253ABrand%3B8.0.0.0%7CCh
romium%3B111.0.5563.149&uamb=0&uam=&uap=Windows&uapv=10.0.0&uaw=0&sid=1681148414&sct=2&seg=1&dl=http
s%3A%2F%2Fwww.conemaugh.org%2Fresults%3Fquery%3DI%28have%2Bdementia&dr=https%3A%2F%2Fwww.conemaugh.o
rg%2Ffind-a-doctor%2Fresults%3Fquery%3Dmichelle%2Bstoudt%252C%2Bdo%26gender%3Df%26language%3Den%26is
AcceptingNewPatients%3Dtrue%26specialty%3Df8158a0c-099f-44f2-8647-975fdc91867b&dt=Behavioral%20Healt
h%20%7C%20Conemaugh%20Health%20System&_s=1

:scheme: https

accept: */*

accept-encoding: gzip, deflate, br

accept-language: en-US,en;q=0.9

content-length: 77

content-type: text/plain;charset=UTF-8

origin: https://www.conemaugh.org

referer: https://www.conemaugh.org/

sec-ch-ua: "Microsoft Edge";v="111", "Not(A:Brand";v="8", "Chromium";v="111"

sec-ch-ua-mobile: ?0

sec-ch-ua-platform: "Windows"

sec-fetch-dest: empty

sec-fetch-mode: no-cors

sec-fetch-site: cross-site

user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/1
11.0.0.0 Safari/537.36 Edg/111.0.1661.62

*Figures 15 & 16. The screenshots above were captured from the user's network report and depict what types of information Google received. Notably, the user was executing their search through the Microsoft Edge web browser, not the Google Chrome browser. Stated differently, Google would not have received this information but for Defendant's use of Google's analytics tools.*

117.    Defendant's use of the Google Analytics tool causes Google to receive patients' communications with Defendant alongside the patients' IP address, which is also impermissible under HIPAA.

118.    Additionally, upon information and belief and as described above, Defendant also installed and used Facebook's Conversions API tool when it implemented the Pixel because: (1)

the Pixel is automatically programmed to function via both first-party and third-party cookies; and (2) Conversions API works in conjunction with the Pixel and other Facebook Business Tools to transmit information to Facebook.

119.    While the third-party cookies described above allow Facebook to match information to a specific individual, the Conversions API tool and first-party cookies Defendant installed record, store, and transmit users' communications and Private Information directly to Facebook even when the user has blocked or disabled third-party cookies in their web browser.

120.    These "server to server" communications cannot be accessed by Plaintiff because they are not transmitted via the web user's browser and do not otherwise rely on third-party cookies to facilitate the transmission of data.

121.    Defendant does not disclose that its Pixel, the Google Analytics tool, Conversions API tracks, and similar tools transmit Plaintiff's and Class Members' Private Information to Facebook as they communicate information via Defendant's Digital Platform.

122.    Likewise, Defendant never received Plaintiff and Class Members' consent or written authorization to disclose their Private Information and communications to Google or Facebook.

### C. Plaintiff Tacey Haberkorn's Experiences

123.    Plaintiff received healthcare services starting in 2021 and continuing through the present day at hospitals and clinics in Defendant's network and has used Defendant's Digital Platform to look up physician information on numerous occasions.

124.    Plaintiff used Defendant's Digital Platform frequently and regularly from 2021 through 2022.

125.    Plaintiff accessed Defendant's Digital Platform to receive healthcare services from Defendant or Defendant's affiliates, at Defendant's direction, and with Defendant's encouragement.

126.    Plaintiff has been a Facebook user since 2009.

127.    On numerous occasions, Plaintiff accessed Defendant's Digital Platform on the phones she has had over the years. Plaintiff used the Digital Platform to search for specific doctors and specialists who could help with specific conditions, make appointments, check her medical records and test results, and fill out medical forms.

128.    Plaintiff submitted medical information to Defendant via both its Website and MyChart portal. Because Defendant utilizes the Facebook Pixel, the Digital Platform's Source Code sent a secret set of instructions back to Plaintiff's browser, causing the Pixel to send Plaintiff's FID, the Pixel ID, and both the webpage's and MyChart portal's URLs to Facebook.

129.    Pursuant to the systematic process described in this Complaint, Plaintiff's Private Information was disclosed to Facebook, and this data included her PII, PHI, and related confidential information. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

130.    As Defendant's patient, Plaintiff reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to a third party. But for her status as Defendant's patient, Plaintiff would not have disclosed her Private Information to Defendant.

131.    During her time as a patient, Plaintiff never consented to the use of her Private Information by third parties or to Defendant enabling third parties, including Facebook, to access or interpret such information.

132.    Notwithstanding, through the Pixel and Conversions API, Defendant transmitted Plaintiff's Private Information to third parties, such as Facebook and Google.

133.    Plaintiff would not have used Defendant's Digital Platform or health care services, or would have paid less for them, had she known that her Private Information was being disclosed to third parties for Defendant's financial benefit and for its marketing purposes.

134.    Defendant's Digital Platform routinely provided Facebook with its patients' FIDs, IP addresses, and/or device IDs or other information they input into Defendant's Digital Platform, like their home address, zip code, or phone number. This is precisely the type of information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients.[53] Plaintiff's and Class Members' identities could be easily determined based on the FID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

135.    After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the Digital Platform visitor is also a Facebook user, Facebook will associate the information that it collects from the visitor with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook

---

[53] https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited April 18, 2022)

Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

136.    In sum, Defendant's Pixel transmitted Plaintiff's highly sensitive communications and Private Information to Facebook, including communications that contained Private and confidential information, without Plaintiff's knowledge, consent, or express written authorization.

137.    Defendant breached Plaintiff's right to privacy and unlawfully disclosed her Private Information to Facebook. Specifically, Plaintiff had a reasonable expectation of privacy, based on her status as Defendant's patient, that Defendant would not disclose her Private Information to third parties.

138.    Defendant did not inform Plaintiff that it shared her Private Information with Facebook.

139.    By doing so without Plaintiff's consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed Plaintiff's Private Information.

140.    Upon information and belief, as a "redundant" measure to ensure Plaintiff's and Class Members' Private Information was successfully transmitted to third parties like Facebook, Defendant implemented server-based workarounds like Conversions API to send Plaintiff's and Class Members' Private Information from electronic storage on Defendant's server directly to Facebook.

141.    Plaintiff suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted

advertisements specific to Plaintiff's medical conditions and other confidential information she communicated to Defendant via the Digital Platform.

142.    Plaintiff has a continuing interesting in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

**D.  Defendant's Conduct Is Unlawful and Violated Industry Norms**

*i. Defendant Violated HIPAA Standards*

143.    Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[54]

144.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

145.    The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[55]

146.    The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

---

[54] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[55] HHS.gov, HIPAA For Professionals (last visited April 12, 2023), https://www.hhs.gov/hipaa/forprofessionals/privacy/index.html.

147.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

148.    Under the HIPPA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

a.   Names;

\*\*\*

H.  Medical record numbers;

\*\*\*

J.   Account numbers;

\*\*\*

M.  Device identifiers and serial numbers;

N.  Web Universal Resource Locators (URLs);

O.  Internet Protocol (IP) address numbers; … and

R.  Any other unique identifying number, characteristic, or code…;and"

The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

149.    The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

150.    An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

151.    The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

152.    Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

153.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[56]

154.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.* (Emphasis added).[57]

155.    As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[58]

156.    The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

157.    Defendant's actions violated HIPAA Rules per this Bulletin.

---

[56]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Nov. 3, 2022).
[57]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Nov. 3, 2022)
[58] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

### ii. Defendant Violated Pennsylvania Law

158.    Pennsylvania law has established policies and procedures for the maintenance, preservation, and storage of patient medical records.

159.    All patient medical records "shall be treated as confidential." Pa.C.S.A. § 115.27. In addition, a hospital must receive written authorization of a patient "for release of medical information outside the hospital." *Id.*[59]

160.    Further, the Pennsylvania Patient's Bill of Rights provides that "a patient has the right to every consideration of his privacy concerning his own medical care program" and "the right to have all records pertaining to his medical care treated as confidential except as otherwise provided by law or third-party contractual arrangements." 28 Pa.C.S.A § 103.22(b)(3-4).

161.    Defendant's actions described herein violated Pennsylvania law.

### iii. Defendant Violated Industry Standards

162.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

163.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

164.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

165.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

---

[59] Pennsylvania law also states that "medical records are the property of the hospital" but that "they shall not be removed from the hospital premises except for court purposes" and that copies may only be made available "for authorized appropriate purposes such as insurance claims, and physician review, consistent with § 115.27 (relating to confidentiality of medical records)." 28 Pa.C.S.A. §115.28.

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

166.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

**E. Plaintiff's and Class Members' Expectation of Privacy**

167.    Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

168.    Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

169.    Plaintiff and Class Members would not have used Defendant's Digital Platform, would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

**F.  IP Addresses Are Personally Identifiable Information**

170.    On information and belief, through the use of the Facebook Pixel on Defendant's Digital Platform, Defendant also disclosed and otherwise assisted Facebook with intercepting Plaintiff's and Class Members' Computer IP addresses.

171.    An IP address is a number that identifies the address of a device connected to the Internet.

172.    IP addresses are used to identify and route communications on the Internet.

173.    IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

174.    Facebook tracks every IP address ever associated with a Facebook user.

175.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

176.    Under HIPAA, an IP address is considered personally identifiable information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See* also, 45 C.F.R. § 164.514(b)(2)(i)(O).

177.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

### G. Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures

178.    The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiff's and class members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data for advertising in the absence of express written consent. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.  In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on its platform.

179.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

180.    Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients to get more patients to use its services. Defendant did so through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

181.    By utilizing the Pixel, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiff and Class Members and violating their rights under federal and Pennsylvania law.

### H. Plaintiff's and Class Members' Private Information Had Financial Value

182.    Plaintiff's data and Private Information has economic value. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients.

183.    Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

184.    The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[60]

185.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[61]

**TOLLING**

186.    Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her PII and PHI was intercepted and unlawfully disclosed to Facebook because Defendant kept this information secret.

---

[60] *See* https://time.com/4588104/medical-data-industry/ (last visited February 16, 2023).
[61]    *See*    https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited March 1, 2023).

## CLASS ACTION ALLEGATIONS

187.    Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

188.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

All individuals residing in the United States who are, or were, patients of Defendant or any of its affiliates, used Defendant's Digital Platform and had their Private Information disclosed to a third party without authorization.

In the alternative, Plaintiff seeks to represent a "Pennsylvania Class" defined as:

All individuals residing in Pennsylvania who are, or were, patients of Defendant or any of its affiliates, used Defendant's Digital Platform, and had their Private Information disclosed to a third party without authorization or consent.

The Nationwide Class and Wisconsin Class are collectively referred to as the "Class."

189.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

190.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

191.    <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Facebook, and the Class is identifiable within Defendant's records.

192.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a.  Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b.  Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c.  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

d.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

e.  Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

g.  Whether Defendant's conduct violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A §§ 5701, *et seq.*

h.  Whether Defendant's conduct violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S.A. §§201-1, *et seq.*;

i.  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

j.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

193.    <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

194.    <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

195.    <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

196.    <u>Policies Generally Applicable to the Class</u>. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

197.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

198.    The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

199.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

200.    Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

201.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

202.    <u>Issue Certification</u>, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

      a.  Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

      b.  Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

      c.  Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

      d.  Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

    e.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

    f.    Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

<u>**COUNT I**</u>
**VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT, 18 Pa.C.S.A §§ 5701, *et seq*.**
**(On Behalf of Plaintiff and the Class)**

203.    Plaintiff incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

204.    The Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA") is codified at 18 Pa.C.S.A §§ 5701, *et seq*.

205.    18 Pa.C.S.A. § 5725 provides, in pertinent part, as follows:

(a) Any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication; and shall be entitled to recover from any such person: (1) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher; (2) Punitive damages. (3) A reasonable attorney's fee and other litigation costs reasonably incurred.

206.    The WESCA defines "electronic communication" as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system, except: (1) [d]eleted, (2) [a]ny wire or oral communication, (3) [a]ny communication made through a tone-only paging device, or (4) [a]ny communication from a tracking device (as defined in this section)." 18 Pa.C.S.A. § 5702. It further defines "intercept" as "[a]ural or other acquisition of the contents of

any wire, electronic or oral communication through the use of any electronic, mechanical or other device." *Id*.

207.    At all relevant times, Defendant disclosed and/or used Plaintiff's and Class Memebrs' Private Information and procured, aided, employed, agreed with, and conspired with Facebook to intercept, disclose, and/or use Plaintiff's and Class Members' internet communications while accessing https://www.conemaugh.org, including the contents thereof— i.e., the URL visited, the medical conditions and types of doctors searched, whether and with whom the patient had a medical e-visit, payment of medical bills, and the contents of any live chats. Such information not only constitutes protected health information, it also represents the substance, import, and meaning of the communications between Plaintiff and other Class Members had with Defendant's Digital Platform.

208.    Plaintiff and other Class Members had a reasonable expectation of privacy in the electronic communications they had with Defendant's Digital Platform.

209.    Nonetheless, these electronic communications were transmitted to and intercepted by a third party (*i.e.*, Facebook) during the communication and without knowledge, authorization, or consent of Plaintiff and Class Members. That is because Defendant intentionally inserted an electronic device or apparatus into its Digital Platform that, without the knowledge and consent of Plaintiff and Class Members, recorded and transmitted the substance of their confidential communications with Defendant to a third party.

210.    Defendant willingly procured and facilitated Facebook's interception and collection of Plaintiff's and Class Members' Private Information by embedding the Facebook Pixel on its Digital Platform.

211.    Defendant used the following items as a device or apparatus to intercept wire, electronic, or oral communications made by Plaintiff and other Class Members:

    a.  The computer codes and programs Facebook used to track Plaintiff's and Class Members' communications while they were navigating the Digital Platform;

    b.  Plaintiff's and Class Members' browsers;

    c.  Plaintiff's and Class Members' computing and mobile devices;

    d.  Facebook's web and ad servers;

    e.  The web and ad-servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Digital Platform;

    f.  The computer codes and programs used by Facebook to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's Digital Platform; and

    g.  The plan Facebook carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit Defendant's Digital Platform.

212.    Defendant failed to disclose that it is using the Facebook Pixel specifically to track and automatically and simultaneously transmit communications to a third party, *i.e.*, Facebook.

213.    To avoid liability under the WESCA, a defendant must show it had the consent of *all* parties to a communication.

214.    The patient communication information that Defendant transmits while using the Facebook Pixel, such as doctor appointment booking information and names, IP addresses, and home addresses, constitutes protected health information.

215.    As demonstrated hereinabove, Defendant violates the WESCA by disclosing and using Private Information without consent and by aiding and permitting third parties to receive its patients' online communications in real time through its Digital Platform without their consent.

216.    By disclosing Plaintiff's and Class Members' Private Information, Defendant violated Plaintiff's and Class Members' statutorily protected privacy rights.

217.    As a result of the above violations and pursuant to 18 Pa.C.S.A § 5725(a), Plaintiff and Class Members are entitled to actual damages or liquidated damages of $1,000 or $100 per day for each violation, whichever is higher.

218.    Under the statute, Defendant is also liable for reasonable attorneys' fees, reasonable litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## COUNT II
### INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Class)

219.    Plaintiff incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

220.    The Private Information of Plaintiff and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

221.    Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

222.    Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

223.    Defendant owed a duty to Plaintiff and Class Members not to give publicity to their private lives to Facebook and, by extension, other third-party advertisers and businesses who purchased Facebook's advertising services.

224.    Defendant's unauthorized disclosure of Plaintiff's and Class Members' Private Information to Facebook, a third-party social media and marketing giant, is highly offensive to a reasonable person.

225.    Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Private Information constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

226.    Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant exceeded its authorization to access Plaintiff's and Class Members' information and facilitated Facebook's simultaneous eavesdropping and wiretapping of confidential communications.

227.    Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it installed the Pixel onto its Digital Platform because the purpose of the Pixel is to track and disseminate individual's communications with the Digital Platform for the purpose of marketing and advertising.

228.    Because Defendant intentionally and willfully incorporated the Facebook Pixel into its Digital Platform and encouraged patients to use that Digital Platform for healthcare purposes,

Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

229.    As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiff and the Class Members was disclosed to third parties without authorization, causing Plaintiff and the Class to suffer damages.

230.    Plaintiff, on behalf of herself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

231.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of Facebook and other third parties and the wrongful disclosure of the information cannot be undone.

232.    Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

233.    Plaintiff, on behalf of herself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (on behalf of Plaintiff and the Class)

234.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

235.    As a condition of utilizing Defendant's Digital Platform and receiving services from Defendant's healthcare facilities and professionals, Plaintiff and the Class Members provided their Private Information and compensation for their medical care.

236.    When Plaintiff and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

237.    Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

238.    Plaintiff and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

239.    Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information without consent to third parties like Facebook.

240.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

241.    Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

242.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

243.    Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

244.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

245.    Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

246.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

247.    The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Pennsylvania and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

248.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

### COUNT V
### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiffs and the Class)

249.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

250.    In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendant did and does store and disclose.

251.    Defendant had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of this relationship, in particular, to keep private and not disclose the Private Information of its patients.

252.    Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to keep their Private Information confidential and by disclosing it to third parties.

253.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1).

254.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3).

255.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4).

256.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members violation of 45 C.F.R. § 164.308(b) by failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiff's and Class Members PHI.

257.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).

258.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1).

259.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.

260.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5).

261.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to keep Private Information confidential as required by 28 Pa.C.S.A. §115.27.

262.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to keep Private Information confidential as required by the Pennsylvania Patient's Bill of Rights, 28 Pa.C.S.A. §103.22(b)(3-4).

263.    Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

264.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, as described above.

**<ins>COUNT VI</ins>**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1) *et seq*.**
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiff and the Class)**

265.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

266.    The ECPA protects both sending and receipt of communications.

267.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

268.    The transmissions of Plaintiff's Private Information to Defendant via Defendant' Digital Platform qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

269.    The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

270.    **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Digital Platform with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

271.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

272.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

273.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.   Plaintiff's and Class Members' browsers;

b.  Plaintiff's and Class Members' computing devices;

c.  Defendant's web-servers; and

d.  The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications.

274.  Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Pixel imbedded and ran on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.  18 U.S.C. § 2511(1)(c).

275.  Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Pixel imbedded and ran on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health care services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.  18 U.S.C. § 2511(1)(d).

276.  Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the source code it imbedded and ran on its web properties, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

277.    Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

278.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

279.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

280.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

281.    Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

282.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

283.    Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

284.    **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a

tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, violations of the Pennsylvania Patient's Bill of Rights, Pennsylvania confidentiality of medical records statute, and invasion of privacy, among others.

285.    The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

286.    Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information does not qualify for the party exemption.

287.    Defendant's acquisition of patient communications that were used and disclosed to Facebook and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Pennsylvania, including.

    a.    Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

    b.    Criminal violation of Pennsylvania Computer Crime statutes, including: Unlawful use of computer (18 Pa.C.S.A. §7611); Unlawful duplication (18 Pa.C.S.A. §7614); and Computer trespass (18 Pa.C.S.A. §7615);

    c.    Violation of the Pennsylvania Patient's Bill of Rights, 28 Pa.C.S.A. §§103.22;

    d.    Violation of Pennsylvania statute regarding the confidentiality of medical records, 28 Pa.C.S.A.§ 115.27;

    e.    Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S.A. §§ 201-1, et seq.; and

    f.    Invasion of Privacy.

288.    Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

289.    The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

290.    Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

   a.    Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

   b.    Disclosed individually identifiable health information to Facebook and Google without patient authorization.

291.    Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook and Google source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

292.    Under 18 Pa.C.S.A. §7611, a person commits the offense of unlawful use of a computer if he:

   a.    accesses or exceeds authorization to access, alters, damages or destroys any computer, computer system, computer network, computer software, computer program, computer database, World Wide Web site or telecommunication device or any part thereof with the intent to interrupt the normal functioning of a person or to devise or execute any scheme or artifice to defraud or deceive or control property or services by means of false or fraudulent pretenses, representations or promises;

b.   intentionally and without authorization accesses or exceeds authorization to access, alters, interferes with the operation of, damages or destroys any computer, computer system, computer network, computer software, computer program, computer database, World Wide Web site or telecommunication device or any part thereof; or

c.   intentionally or knowingly and without authorization gives or publishes a password, identifying code, personal identification number or other confidential information about a computer, computer system, computer network, computer database, World Wide Web site or telecommunication device.

293.   Defendant violated the 18 Pa.C.S.A. §7611 in that:

a.   Defendant accessed and exceeded authorization to access Plaintiff's and Class Members' computing devices and data as part of a deception and without their authorization, including through placement of the fbp, ga, and gid cookies as well as use of source code that commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communications with Defendant simultaneously to Defendant and Facebook, Google, and others; and

b.   Defendant intentionally or knowingly and without authorization gave or published confidential information about Plaintiff's and Class Members' computer or telecommunication device to third parties.

294.   Under 18 Pa.C.S.A. §7614, a person commits the offense of unlawful duplication if he makes or causes to be made an unauthorized copy, in any form, including but not limited to, any printed or electronic form of computer data, computer programs, or computer software residing in, communicated by or produced by a computer or computer network.

295.    Defendant violated 18 Pa.C.S.A. §7614 by exceeding its authorization to access Plaintiff's and Class Members' computers including through placement of the fbp, ga, and gid cookies as well as use of source code that commanded Plaintiff's and Class Members' computing devices to make unauthorized copies of Plaintiff's and Class Members' electronic data and to send identifiers and the content of communications with Defendant simultaneously to Defendant and Facebook, Google, and others.

296.    Under 18 Pa.C.S.A. §7615, a person commits the offense of computer trespass if he knowingly and without authority or in excess of given authority uses a computer or computer network with the intent to:

   a.    temporarily or permanently remove computer data, computer programs or computer software from a computer or computer network; or

   b.    alter or erase any computer data, computer programs or computer software.

297.    Defendant violated 18 Pa.C.S.A. §7615 when it knowingly and without Plaintiff's or Class Members' authorization inserted the fbp, ga, and gid cookies on Plaintiff's and Class Members' computing devices.

298.    The fbp, ga, and gid cookies, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

299.    Defendant knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

300.    Under the Pennsylvania Patient's Bill of Rights, 28 Pa.C.S.A. §§103.22, a patient has the right to every consideration of his privacy concerning his own medical care program. 28

Pa.C.S.A. §103.22(b)(3). In addition, a patient has the right to have all records pertaining to his medical care treated as confidential except as otherwise provided by law or third-party contractual arrangements. 28 Pa.C.S.A. §103.22(b)(4).

301.    Defendant violated the Pennsylvania Patient's Bill of Rights by disclosing Plaintiff's and Class Members' Private Information to third parties without authorization or consent.

302.    Under 28 Pa.C.S.A. § 115.27, all medical records must be treated as confidential. A hospital must receive written authorization of a patient for release of medical information outside the hospital.

303.    Under 28 Pa.C.S.A. § 115.28, medical records are the property of the hospital and shall not be removed from the hospital premises except for court purposes. Copies may only be made available for authorized appropriate purposes such as insurance claims, and physician review, consistent with § 115.27 (relating to confidentiality).

304.    Defendant violated 28 Pa.C.S.A. §§115.27-28 by failing to treat Plaintiff's and Class Members' medical records as confidential and by disclosing those records to third parties outside the hospital without written authorization or consent and without an authorized appropriate purpose. Increasing Defendant's revenues through enhanced marketing and advertising and online targeting is not an authorized appropriate purpose.

305.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their individually-identifiable patient health information on its Digital Platform, because it used its participation in these communications to improperly share Plaintiff's and Class Members' individually-identifiable patient health information with Facebook and Google, third-parties that

did not participate in these communications, that Plaintiff and Class Members did not know were receiving their individually-identifiable patient health information, and that Plaintiff and Class Members did not consent to receive this information.

306.    Defendant accessed, obtained, and disclosed Plaintiff's and Class Members' Private Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

307.    As such, Defendants cannot viably claim any exception to ECPA liability.

308.    Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

    a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually-identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff and the Class Members to suffer emotional distress;

    b.    Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' individually-identifiable patient health information without providing any value or benefit to Plaintiff or the Class Members;

    c.    Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' individually-identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, without providing any value or benefit to Plaintiffs or the Class Members;

d.  Defendant has failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e.  The diminution in value of Plaintiff's and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiff and Class Members intended to remain private no longer private.

309.    As a result of Defendant's violation of the ECPA, Plaintiffs are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT VII**
**BREACH OF CONFIDENCE**
**(On behalf of Plaintiff and the Class)**

310.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

311.    Medical providers have a duty to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information, as recently affirmed in *Opris v. Sincera Reprod. Med.*, CV 21-3072, 2022 WL 1639417, at *11 (E.D. Pa. May 24, 2022).  *See also Burger v. Blair Medical Assoc., Inc.*, 600 Pa. 194, 204, 964 A.2d  374, 380 (2009) ("The duty on a health care facility's part to maintain the confidentiality of medical records arises out of the confidential nature of the relationship and the personal nature of the information which must be disclosed in the ordinary course of medical treatment.").

312.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Digital Platform.

313.    Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Pixel and Conversions API to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

314.    These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

315.    The third-party recipients included, but may not be limited to, Facebook.

316.    The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure of private information and erosion of the essential confidential relationship between the healthcare provider and the patient.

317.    As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

    a.  Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

    b.  Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c.  Defendant eroded the essential confidential nature of the provider-patient relationship;

d.  General damages for invasion of their rights in an amount to be determined by a jury;

e.  Nominal damages for each independent violation;

f.  Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g.  Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h.  Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i.  Defendant's actions violated the property rights Plaintiff and Class members have in their Private Information.

<u>**COUNT VIII**</u>
**NEGLIGENCE**
**(On behalf of Plaintiff and the Class)**

318.    Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

319.    Defendant owed Plaintiff and Class Members a duty to their Private Information completely confidential, and to safeguard sensitive personal and medical information, as recently affirmed in *Opris v. Sincera Reprod. Med.*, CV 21-3072, 2022 WL 1639417, at *11 (E.D. Pa. May 24, 2022).  *See also Burger v. Blair Medical Assoc., Inc.*, 600 Pa. 194, 204, 964 A.2d  374, 380 (2009) ("The duty on a health care facility's part to maintain the confidentiality of medical records arises out of the confidential nature of the relationship and the personal nature of the information which must be disclosed in the ordinary course of medical treatment.").

320.   Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Digital Platform.

321.   Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Pixel and Conversions API to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

322.   These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

323.   The third-party recipients included, but may not be limited to, Facebook.

324.   As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

    a.   Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

    b.   Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c.   Defendant eroded the essential confidential nature of the provider-patient relationship;

    d.   General damages for invasion of their rights in an amount to be determined by a jury;

    e.   Nominal damages for each independent violation;

f.  Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g.  Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h.  Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i.  Defendant's actions violated the property rights Plaintiff and Class members have in their Private Information.

**COUNT IX**
**VIOLATIONS OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1, *et seq.***
**(On behalf of Plaintiff and the Class)**

325.   Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

326.   This cause of action is brought pursuant the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), which Pennsylvania courts have invariably interpreted using the kind of liberal construction afforded to state consumer protection statutes intended to prevent fraud.

327.   Defendant's offer, provision, and sale of services at issue in this case constitute "trade" or "commerce" within the scope of the UTPACPL. *See* 73 P.S. § 201-2(3).

328.   Plaintiff and the Class Members, as "person[s]," are consumers within the protection of the UTPCPL. *See* 73 P.S. § 201-2(2).

329.    By serving as Plaintiff's and Class Members' healthcare provider, Defendant had a duty to protect their Private Information from unlawful disclosure.

330.    Plaintiff and the Class Members paid for or otherwise availed themselves and received services from Defendant, for the purpose of medical treatment.

331.    Defendant engaged in the conduct alleged in this Class Action Complaint, entering into transactions intended to result, and which did result, in the provision of medical treatment to Plaintiff and Class Members.

332.    Defendant's acts, practices, and omissions were done in the course of Defendant's offer of medical treatment, services, and care throughout the Commonwealth of Pennsylvania and the United States.

333.    The unfair, unconscionable, and unlawful acts and practices of Defendant alleged herein, and in particular the decisions regarding the Facebook Pixel and Conversions API, emanated and arose within the Commonwealth of Pennsylvania, within the scope of the UTPCPL.

334.    Defendant, operating in and out of Pennsylvania, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of 73 P.S. § 201-2(4), including but not limited to the following: (a) knowingly promising to protect Plaintiff's and Class Members' Private Information, (b) knowingly and improperly storing, possessing, using, and/or procuring the interception of, Plaintiff's and Class Members' Private Information; and (c) knowingly disclosing Plaintiff's and Class Members' Private Information to third parties, including Facebook.

335.    Defendant committed these acts while concurrently representing that it would protect and not unlawfully disclose Plaintiff's and Class Members' Private Information, and while under a legal obligation to do so.

336.    These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including by not limited to HIPAA, the Pennsylvania Patient's Bill of Rights, Pennsylvania computer crime statutes, statutes regarding the confidentiality of medical records, and the UTPCPL.

337.    Defendant knew or should have known that its Digital Platform and the cookies and source code thereon was unlawfully wiretapping, intercepting, and disclosing Plaintiff's and Class Members' Private Information.

338.    Plaintiff has standing to pursue this claim because as a direct and proximate result of Defendant's violations of the UTPCPL, Plaintiff and Class Members have been "aggrieved" by a violation of the UTPCPL and bring this action to obtain a declaratory judgment that Defendant's acts or practices violate the UTPCPL. *See* 73 P.S. § 201-9.2.

339.    Plaintiff also has standing to pursue this claim because, as a direct result of Defendant's knowing violation of the UTPCPL, Plaintiff and Class Members have lost money or property in the form monies paid for Defendant's services, diminution in value of their Private Information, as well as loss of the benefit of their bargain with Defendant.

340.    Plaintiff and Class Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future loss of Private Information, including, but not limited to: (a) ordering that Defendant immediately remove any pixel, web beacon, cookie, or other tracking technology that causes the disclosure of Private Information to third parties without consent; (b) ordering that Defendant engage third-party security auditors and internal personnel to ensure Plaintiff's and Class Members' Private Information is no longer subject to the unlawful practices described in this Complaint; (c) ordering that Defendant purge, delete, and destroy Private Information not necessary for its provisions of services in a reasonably secure manner;

(d) ordering that Defendant conduct regular database scans and security checks; (e) ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to properly handle Private Information provided via Defendant's Digital Platform; (f) ordering Defendant to meaningfully educate individuals about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps victims should take to protect themselves.

341.    Plaintiff brings this action on behalf of herself and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff, Class Members, and the public from Defendant's unfair methods of competition and unfair, unconscionable, and unlawful practices. Defendant's wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

342.    The above unfair, unconscionable, and unlawful practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

343.    Defendant's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

344.    Plaintiff and Class Members seek relief under the UTPCPL, 73 P.S. §§ 201-1, *et seq.*, including, but not limited to, a declaratory judgment that Defendant's actions and/or practices violate the UTPCPL; injunctive relief enjoining Defendant, their employees, parents, subsidiaries, affiliates, executives, and agents from continuing to violate the UTPCPL as described above.

345.    Plaintiff and Class Members are also entitled to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members:

D.    For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand that this matter be tried before a jury.

DATE: May 15, 2023                    Respectfully Submitted,


                                        */s/ Roy E. Leonard*
                                      Roy E. Leonard
                                      PA Id. No. 54782
                                      **LEONARD PLLC**
                                      105 Market Street, Suite 300
                                      Pittsburgh, PA  15222
                                      Telephone: 412-448-2868
                                      Fax: 412.448.2860
                                      *rleonard@leonardfirm.com*


                                      Gary M. Klinger*
                                      Glen L. Abramson
                                      PA Id. No. 78522
                                      Alexandra M. Honeycutt
                                      **MILBERG COLEMAN BRYSON PHILLIPS
                                      GROSSMAN, PLLC**
                                      227 W. Monroe Street, Suite 2100
                                      Chicago, IL 60606
                                      Telephone: (866) 252-0878
                                      *gklinger@milberg.com*
                                      *gabramson@milberg.com*
                                      *ahoneycutt@milberg.com*

                                      Bryan L. Bleichner*
                                      Philip J. Krzeski*
                                      **CHESTNUT CAMBRONNE PA**
                                      100 Washington Avenue South, Suite 1700
                                      Minneapolis, MN 55401
                                      Phone: (612) 339-7300
                                      Fax: (612) 336-2940
                                      *bbleichner@chestnutcambronne.com*
                                      *pkrzeski@chestnutcambronne.com*

Terence R. Coates*
Dylan J. Gould*
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court St., Ste. 530
Cincinnati, Ohio 4502
Phone: (513) 651-3700
Fax: (513) 665-0219
*tcoates@msdlegal.com*
*dgould@msdlegal.com*

Joseph M. Lyon*
**The Lyon Law Firm**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
*jlyon@thelyonfirm.com*

***Counsel for Plaintiff and the Putative Class***

* *pro hac vice* forthcoming